Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 13, 2003     Decided June 17, 2003

No. 02-1213
& No. 02–1215

ANDANTECH L.L.C., ET AL.,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

Appeals from the United States Tax Court
(TAX Ct. Nos. 15532–98 & 4277–00)

*Walter A. Pickhardt* argued the cause for appellants. With him on the briefs were *Myron L. Frans, Mark Alan Hager*, and *William K. Wilcox*.

*Robert W. Metzler*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Richard Farber*, Attorney.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: SENTELLE, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: This case arises from a final decision of the Tax Court rejecting challenges brought by the petitioners to the Commissioner of Internal Revenue's final administrative adjustments to the partnership tax returns filed by Andantech, L.L.C. for short taxable years ending December 10, 1993 and December 31, 1993, and for the taxable year ending December 31, 1994. The court first held that the 1993 years had been timely assessed by the Commissioner, then rejected the petitioners' claim to $51 million in losses reported on the returns. For the reasons explained below, we affirm the Tax Court in part, and remand the remainder of the issues for further proceedings consistent with this opinion.

*Background*

In June 1993, Comdisco Investment Group, Inc. (CIG), a wholly-owned subsidiary of Comdisco, a lessor, dealer and remarketer of IBM computer equipment, approached Norwest Corporation and its subsidiary, NEFI, with a proposal for a computer leasing transaction that would produce significant tax savings. CIG described the concept for the transaction in its proposal as follows:

> Comdisco has developed a cross-border equipment leasing transaction that produces permanent U.S. tax savings through the advantageous use of U.S. tax rules concerning the acceleration of taxable income from rents.
>
> Unlike most Western countries, the United States treats as taxable income any amounts received as prepaid rent or as proceeds from a sale, without recourse, of a stream of rental payments. These amounts are income even though they are unearned and are attributable to future years.
>
> As will be shown below, the unusual U.S. treatment of these income amounts creates an opportunity for an "arbitrage" between the U.S. tax system and that of

another country (such as Belgium) which does not treat the amounts as currently taxable income.

The essential elements of the transaction are as follows:

1.  Two Belgian individuals, with experience in all aspects of the leasing business, purchase a portfolio of U.S. computer equipment from Comdisco, Inc. ("Comdisco"). The purchase is made through an entity that is treated as a partnership for U.S. tax purposes (the "Partnership"). The equipment is immediately leased back to Comdisco, which in turn subleases the equipment to its customers, the users of the equipment. Neither the Partnership nor its partners are subject to U.S. tax.

2.  Subsequently, the Partnership sells to a bank the right to receive the rents payable by Comdisco under the lease. The sale of the Comdisco rent stream is without recourse to either the Partnership or to the equipment. Accordingly, from a U.S. point of view, all of the rental income from the Comdisco lease is deemed to have been accelerated. Stated another way, the sale of the rent stream removes or "strips" the rental income from the leased equipment.

3.  At a later date, but without any prior commitment (formal or informal) to do so, a U.S. company may acquire a 98% interest in the Partnership, utilizing certain provisions of the U.S. tax code under which tax attributes carry over to the new owner.

4.  The U.S. company, as 98% partner, would be entitled to depreciation with respect to 98% of the cost of the equipment. No rental income would be reportable by the U.S. company, that income having been accelerated into the tax period prior to the U.S. company's becoming a partner.

5.  The resulting U.S. tax savings from the depreciation would be permanent tax saving, not mere deferrals. They would be reflected in reported earnings.

*Andantech, L.L.C. v. Comm'r*, 83 T.C.M. (CCH) 1476 at 10–11 (2002).

Following the initial presentation, CIG provided NEFI with an economic analysis of a hypothetical lease-stripping transaction, "sample" documents for the sale-leaseback and rent-sale steps of the transaction, and other documents for the formation and operation of the partnership described above. *See id.* at 12–14. Concurrent with the NEFI negotiations, CIG was negotiating with several European individuals for their participation. After initial negotiations with two Swiss individuals fell through, CIG contacted attorney Richard Temko, located in Belgium, who provided two Belgian candidates, Baudoiun Parmentier (BP) and his cousin Federic de La Barre d'Erquelinnes (FBE). *Id.* at 25–27. Temko represented both men. On September 15, 1993, CIG faxed Temko material summarizing the transaction, which showed that when the U.S. company acquired the 98% interest of one foreign partner, the foreign partner would receive preferred stock worth about $612,000, or about .5% of the $122,000,000 sale price.

During negotiations, BP requested, through Temko, that CIG make certain assurances about the deal and the level of his personal financial risk. CIG advised BP that while it could not make such specific assurances, that the U.S. company was a "major public company" and that the shares would include significant financial covenants to ensure payment. A fax dated September 25, 1993 authored by Comdisco's attorney contained the following description of the transaction and its view of the role of the Belgians:

> The entire transaction is expected to involve approximately $120 million. Basically, the individuals forming the company are involved for two months during which the income allocation occurs and then the interest is transferred to the U.S. corporate investor who reaps the benefit of ongoing depreciation deductions.

*See id.* at 28.

On September 25, 1993, Andantech's articles of incorporation were signed and on September 27, 1993, BP, as the

holder of a 98% interest, and FBE, as a 2% interest holder, contributed $196,000 and $4,000, respectively, to the company. A Dutch company was chosen as Andantech's business manager, and contracted to provide its services for a two-and-a-half month period ending December 15, 1993. *See id.* at 28–29. On September 28, 1993, Comdisco and Andantech executed a sale of computer equipment owned by Comdisco to Andantech and an immediate leaseback of the equipment to Comdisco, for a purchase price of $122,415,762. *See id.* at 30–39.

Andantech obtained the financing for the purchase through several loans. *See id.* at 30–31. The Union Bank of Switzerland (UBS) provided a bank loan for $14,995,931, with the condition that if it was not prepaid by December 29, 1993, the interest rate would increase and if three percent or more of the ownership interest in Andantech was transferred, it became immediately payable. *See id.* at 36–37. Comdisco provided a term loan of $87,429,319 and a nonrecourse balloon loan of $19,990,512. The lease for the equipment gave Comdisco two options to purchase the equipment, one which allowed Comdisco to purchase at the end of the term at full market value, and an early termination option which allowed Comdisco to purchase at specified dates prior to the full term. Under this option, the price of the equipment included an early termination supplement. *See id.* at 30–35. On October 29, 1993 Andantech and NationsBank executed an agreement under which NationsBank purchased a portion of the rents due from Comdisco under the lease for $87,805,802, which accelerated the term loan. NationsBank then paid Comdisco the amount necessary to satisfy the term loan. *Id.* at 39.

On November 30, 1993, the two partners BP and FBE withdrew, in total, $189,882.89 from Andantech's capital. One week later, on December 6, 1993, EICI was organized as a Delaware corporation with FBE as the sole shareholder, and three days later, he transferred his two percent Andantech interest to EICI. On December 28, 1993, he transferred all of his EICI stock to a charitable support trust established by Comdisco. *See id.* at 40. On December 10, 1993, BP trans-

ferred his 98% Andantech interest to RD Leasing, a Norwest subsidiary, in exchange for 6,150 shares of preferred stock. The shares were worth about $615,000, and were encumbered with a number of conditions beneficial to BP. This transfer accelerated the due date of the UBS loan, and Andantech received the cash needed to pay off the loan from capital contributions from RD Leasing and EICI. NEFI funded the RD Leasing contribution, and EICI was funded by a UBS loan made as an accommodation to Comdisco and guaranteed by Comdisco. *Id.* at 41–43.

In 1996, Comdisco exercised its early termination option on the lease, and because the value of the equipment on the date of the termination was less than what was owed under the balloon loan, Comdisco owed only $353,366, which was to go entirely to EICI. Partnership returns for Andantech were filed, with the following income and losses reported. For the short year September 25, 1993 to December 10, 1993 BP's partner share of income was $85,191,494 and FBE's was $1,738,736 and EICI reported a $134 loss. For the short year December 11, 1993 to December 31, 1993, RD Leasing reported a $2,101,058 loss and EICI reported a $42,879 loss, without income. Finally, for the full year ending December 31, 1994 RD Leasing reported a $49,069,009 loss and EICI reported a $1,001,388 loss, again without income. *Id.* at 48–50.

On audit, the Commissioner determined that the first short-year period should be disregarded, and the income reported for that period should be properly allocated to the December 31, 1993 period, and all of the 1993 deductions should be allowed. The Commissioner also determined that the losses reported for 1994 should be disallowed, on the grounds that the sham-transaction doctrine applied to the transactions and that BP and FBE were not real partners. The Commissioner issued an final partnership administrative adjustment (FPAA) for each period reflecting these determinations.

NEFI, Norwest and EICI filed petitions in the Tax Court challenging those proposed adjustments. In addition, they argued that the FPAAs for the 1993 periods were time

barred under 26 U.S.C. § 6229(a) (2000). The Tax Court rejected the time-bar argument, observing that it was contrary to the plain language of the statute, and to the court's own precedent set in *Rhone-Poulenc Surfactants & Specialities, L.P. v. Comm'r*, 114 T.C. 533 (2000). The court then addressed the merits of the petitioners' claims and held that Andantech should not be recognized as a valid partnership, that the sale-leaseback should be disregarded under the sham-transaction doctrine and that for tax purposes, the sale was not a sale and the financing did not constitute genuine debt. *See Andantech, L.L.C.* at 62–63. The court then held that: (1) Andantech's December 10 short period should be disregarded, (2) Andantech was not required to include the income from the sale of the rents and was not entitled to deduct $2,143,937 as expenses from other rental activities for the December 31 short period, and (3) Andantech was not entitled to deduct $50,069,397 for the same expenses in 1994. *Id.* at 110.

*Analysis*

On appeal, Norwest and NEFI again challenge the Tax Court's interpretation of the statute of limitations, as well as the merits of the court's decision. First, we would note that this is a very complex case, as the length of the recital of the pertinent facts illustrates. As an initial matter, we affirm the Tax Court's application of the statute of limitations in § 6229(a), as mandated by the plain language of the statute. Second, although we agree with the Tax Court that the Andantech partnership should be disregarded under the sham-transaction doctrine as we explained it in *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505 (D.C. Cir. 2000), the record is not sufficiently clear to establish the court's jurisdiction over the consequences of that decision with regard to the allocation of the resulting profits and losses for tax purposes. Because the government virtually conceded this point at oral argument, we will affirm merely the Tax Court's determination that the Andantech partnership should be disregarded, and remand the other issues to the Tax Court for further proceedings consistent with this decision.

We review the decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482 (2000). Questions of law are reviewed *de novo*, *see United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999), and factual findings for clear error. *See Comm'r v. Duberstein*, 363 U.S. 278, 291 (1960). We have also held that in tax cases, mixed questions of law and fact are to be treated as questions of fact. *See ASA Investerings*, 201 F.3d at 511 (citing *Fund for the Study of Economic Growth and Tax Reform v. IRS*, 161 F.3d 755, 759 (D.C. Cir. 1998)). Applying those standards to the record before us, we first affirm the Tax Court's interpretation of two sections of the Internal Revenue Code, 26 U.S.C. §§ 6501; 6229(a), to allow for an extension of the period in which the IRS may properly assess items attributable to a partnership. As the Tax Court explained, it had recently decided this exact issue in *Rhone-Poulenc* and relied on the analysis employed in that case when presented with the petitioners' claim here. *See Andantech, L.L.C.* at 52–53. In essence, the court reasoned that § 6501 provides a general period of limitations for assessing and collecting any tax imposed by the Code, and that § 6229(a) sets forth a minimum period for assessing any income tax with respect to any person that is attributable to any partnership item or affected item. Based on the language of the statute, the court held that § 6229(a) was not a separate limitations period, but simply set a minimum or allowed an extension of an assessment period, complementing the one set in § 6501. *See id.*

The plain language of § 6501 compels its application to all assessments. See 26 U.S.C. § 6501(a) ("[t]he amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . ."). There are no exceptions for partnership items mentioned in the provision. Section 6229(a), in contrast, establishes a period for making assessments attributable to partnership items, and references § 6501, as follows:

> Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any part-

nership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of—

(1) the date on which the partnership return for such taxable year was filed, or

(2) the last day for filing such return for such year (determined without regard to extensions).

26 U.S.C. § 6229(a). The government argues that the "shall not expire" language of § 6229, together with the broad application of § 6501 work in conjunction to provide for a minimum or extension of the § 6501 period, not an independent statute of limitations for partnership items. This interpretation of the provision would therefore ensure that the IRS could assess a partnership tax against a late or non-filing partner. The government argues that the § 6229 language contrasts with the mandatory language in § 6501, providing evidence that Congress did not intend for this section to operate independently of § 6501.

In *Rhone-Poulenc*, the Tax Court spoke out unequivocally and specifically on the exact point in contention here.

Section 6501 unequivocally provides the period of limitations within which "the amount of *any* tax imposed by this title shall be assessed." Generally, the period of limitations so provided is 3 years from the date the taxpayer's return was filed but varies in the case of certain enumerated exceptions. The pertinent language of section 6229 is: "*[T]he period for assessing any tax imposed by subtitle A* with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year *shall not expire before* the date which is 3 years after the later of*" the filing or due date of the partnership return. (Emphasis added.) Section 6229 provides a *minimum* period of time for the assessment of any tax attributable to partnership items (or affected items) notwithstanding the period provided for in section 6501, which is ordinarily the *maximum* period for the assessment of any tax. The section 6229 minimum period may expire before or after the section

> 6501 maximum period. Indeed, section 6501(n)(2) cross-references section 6229 by providing: "For *extension* of period in the case of partnership items (as defined in section 6231(a)(3)), see section 6229."

*Rhone-Poulenc*, 114 T.C. at 542 (internal citations omitted).

There is nothing about the court's reasoning in *Rhone-Poulenc*, nor in its reliance on that case here that gives us pause. The language of § 6501 plainly refers to all the assessments made pursuant to the chapter, and specifically notes that § 6229 may be used to extend the period in case of partnership items. Likewise, the language of § 6229, rather than simply stating a three-year statute of limitations, indicates by the use of the term "shall not expire" that the provision is intended to dictate a minimum period, but not an absolute restriction. Because we find the reasoning and analysis first applied by the Tax Court in *Rhone-Poulenc*, then followed in the present case reasonable, persuasive, and ultimately convincing, we affirm its decision. Therefore, the Commissioner properly and timely assessed and filed adjustments for the 1993 Andantech partnership returns.

This brings us to the merits of this case. The Tax Court's decision first held that the Andantech partnership, in either its foreign or U.S. form was not a valid partnership because neither BP and FBE, nor EICI and RD Leasing intended to join together to carry on a business for a non-tax business purpose, thus implicating the sham-transaction doctrine. The court concluded that the partnership should therefore be disregarded for tax purposes. *See Andantech, L.L.C.* at 62–68. It then held, in the alternative, that the participation of the above named "partners" should be disregarded under the step-transaction doctrine. Finally, the court held that the sale-leaseback transactions between Andantech and Comdisco should be disregarded with respect to both those entities, as well as with respect to Norwest and RD Leasing because the transaction lacked economic substance and a non-tax business purpose. *See id.* at 63. The result of the Tax Court's findings was to enforce the Commissioner's proposed adjustments. We affirm the Tax Court's determination that the

Andantech partnership was invalid. However, we need not reach the other issues presented, because the record before us is insufficient to determine how the reported income and losses should be allocated, once that partnership is disregarded, or whether we have the jurisdiction to make that decision. We therefore affirm the Tax Court in its invalidation of the Andantech partnership and remand the remainder of the case to it for further proceedings.

We stated in *ASA Investerings* that the basic inquiry in which we engage when determining whether a partnership is valid for tax purposes is "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *ASA Investerings*, 201 F.3d at 513. *See also Comm'r v. Culbertson*, 337 U.S. 733, 742–43 (1949). We held in *ASA* that merely "engaging in business activity [is not] sufficient to validate a partnership" and that "the absence of a nontax business purpose is fatal" to the validity of a partnership. *ASA Investerings*, 201 F.3d at 512–13. The Tax Court applied these principles to the facts of this case when it examined whether the Andantech partnership in either its BP–FBE form, or its RD Leasing–EICI form should be valid, recognizable entities for taxation purposes.

The Tax Court was presented with ample evidence from which it could reasonably draw its conclusion. The court approached the issue of the validity of the partnership in two parts, first considering whether BP and FBE had the intention of forming the partnership to carry on a business activity with a non-tax business purpose, then considering whether the U.S. partners who acquired the Belgians' interests had such a purpose.

First, the court stated:

> We are convinced that Messrs. Parmentier and de la Barre d'Erquelinnes did not intend to join together in order to share in any profit or loss from the business activity of Andantech–Foreign; namely, the sale and leaseback of computer equipment. Rather, to the contrary, we are convinced that Mr. Parmentier's true busi-

> ness objective was to profit from the preferred stock of RD Leasing that he expected to receive.

*Andantech, L.L.C.* at 64. This conclusion was well-supported by the evidence the court recited. *Id.* Correspondence between the Belgians' attorney, Temko, and Comdisco reflected BP's strong interest in getting "assurances" from Comdisco that he and FBE could promptly recover their $200,000 investment, withdraw from Andantech without expense and incur no potential liabilities for Andantech's debt or operations. This evidence demonstrated that the intent of the Belgians was not to run the business as a partnership or otherwise, but to assist with a transaction for which they, or at least BP, would be well compensated. Their contribution of cash was comparatively minimal and borrowed, and they withdrew almost all of it from the company after only three months, exactly as outlined in the June proposal. BP and FBE had only been made aware of the deal and offered their participation after an earlier pair of potential European partners backed out, and had a maximum of two weeks to consider the deal before the formation of the partnership. This, too, illustrates the lack of intent to actually enter into the partnership for a purpose other than to facilitate the proposed tax-beneficial transaction. The terms of the deal offered further evidence of the intent of the participants. For example, Andantech hired a Dutch business manager to run Andantech, but with a contract of only two and a half months, coinciding precisely with the timeline described in the proposal memo for the income-stripping transaction, and the time period in which the transaction, in fact, occurred.

The court also noted that negotiations over the sale and leaseback of the equipment were conducted between Comdisco and NEFI without participation by either BP or FBE. The court stated that based on this evidence, it was apparent that BP intended to profit only through the preferred stock he received upon the sale of Andantech to RD Leasing, and not from the running of the business. The court also noted that FBE did not apparently intend to profit at all, but simply lent his two percent and his name to the partnership for the purpose of facilitating the existence of a partnership, so that

the tax avoidance transaction could succeed. *See Andantech, L.L.C.* at 66. The record, therefore, amply supports the court's conclusion that "Andantech–Foreign was not created for the purpose of carrying on a trade or business but rather to strip the income from the transaction and avoid U.S. taxation." *Id.*

The court treated as a separate matter the Andantech partnership in its U.S. form, after both FBE and BP had been bought out by RD Leasing and EICI. The court found that the partnership in that form was also invalid because the record evidence demonstrated that EICI did not intend to join RD Leasing in the carrying out of the business of computer equipment leasing. Here again, the court's conclusions were supported by ample evidence. As the court noted, there was no evidence that EICI had assets other than its interest in Andantech, and its only means of repaying the UBS loan was through the distribution of that interest in the case of Comdisco's exercise of its early termination option. Further, EICI did not participate in the negotiations of the transaction, and did not profit from them. EICI did not exist before the transactions at issue in this case, and the evidence fully supports the conclusion that it was created solely as a vehicle to dispose of FBE's interest and create a second participant to create the illusion of a partnership, much as FBE served in the original partnership. Therefore, because none of the partners involved in the Andantech partnership at any point during its life had a non-tax business purpose for forming the partnership, we affirm the Tax Court's holding and disregard the Andantech partnership.

As we stated in *ASA Investerings*, the absence of a non-tax business purpose for a partnership is fatal to its validity. We also recognized in that case that the "business purpose" doctrine can be "hazardous" in its application. *See ASA Investerings*, 201 F.3d at 513. We stated:

> It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax. When the business purpose doctrine is violated, such structuring is deemed to have gotten out of

hand, to have been carried to such extreme lengths that the business purpose is no more than a facade. But there is no absolutely clear line between the two. Yet the doctrine seems essential. A tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device. The business purpose doctrine reduces the incentive to engage in such essentially wasteful activity, and in addition helps achieve reasonable equity among taxpayers who are similarly situated—in every respect except for differing investments in tax avoidance.

*Id.*

The formation and use of the Andantech partnership in both its variations demonstrate exactly the type of "wasteful activity" to which we referred. Although it is possible that the computer leasing business could have been profitable and beneficial to any one of the parties involved, there was no evidence of a non-tax need to form the partnership in order to take advantage of the potential profits of the business. FBE's participation was so minimal, the court could easily conclude that his presence was required only to make possible the formation of a partnership, itself formed only to create a benefit from the method of taxing that entity. In addition, there was almost no evidence that any of the partners had any intention of taking advantage of the potential business, especially FBE and EICI, both of whom contributed almost nothing to the transaction, except their existence. Finally, the fact that the entire transaction follows, to the letter, the proposal laid out months prior to its consummation by CIG adds a great deal of credibility to the Tax Court's assessment of the true nature of this partnership. Because we agree with the court that the parties never intended to join together as partners to run a business and that the partnership had no legitimate non-tax purpose, we affirm the court's holding disregarding the Andantech partnership for tax purposes. *Accord ASA Investerings*, 201 F.3d 505; *Boca Investerings P'ship v. United States*, 314 F.3d 625 (D.C. Cir. 2003).

However, this is not a complete result. Without the Andantech partnership, the income and losses attributable to that partnership must still be allocated to a tax payer. We lack a sufficient record on which to determine whether this court, or even the Tax Court is the proper body to resolve this issue. As explained by the government in its brief and at oral argument, even though we have affirmed that Andantech was indeed a sham, the issue of whether the Tax Court, and therefore, this court, have jurisdiction to address whether Norwest, nonetheless, is entitled to depreciation deductions not materially different from ones claimed in the form of losses from Andantech, is apparently still an open one.

As the government explained, the petitions in this case were filed under 26 U.S.C. § 6226, and pursuant to § 6226(f), subject matter jurisdiction is limited "to determin[ing] all partnership items of the partnership for the partnership taxable year to which the [FPAA] relates, the proper allocation of such items among the partners, and [certain penalties]." The government reasoned that while 26 U.S.C. § 6233 (2000) and Treas. Reg. 301.6233–1 extend the limited jurisdiction in § 6226 to permit the Tax Court to determine that a putative partnership that files a partnership return is not a valid partnership and to determine that there are no partnership losses for the putative partners to deduct, they do not provide an unlimited extension of subject matter jurisdiction. The regulation states that "[a]ny [FPAA] or judicial determination . . . may include a determination that the entity is not a partnership for such taxable year as well as determinations with respect to all items of the entity which would be partnership items, as defined in section 6231(a)(3) . . . if such entity had been a partnership in such taxable year . . . ." Treas. Reg. 301.6233–1(a).

The government then argued that Norwest has not demonstrated that these provisions authorize the Tax Court to determine whether the "partners" here may deduct the amounts as non-partners that they could have deducted as partners. The government concludes that whether Norwest is entitled to a deduction as a non-partner involves an item affected by a partnership item, not a partnership item itself,

which would be classified as an "affected item" under 26 U.S.C. § 6231(a)(5) and can not be resolved in a proceeding brought under § 6226. *See Crop Associates–1986 v. Comm'r*, 113 T.C. 198, 202–03 (1999).

Norwest argues that the Tax Court, and consequently this Court, have jurisdiction to allow deductions to the partners of Andantech. Norwest argues that § 6233(a) provides that if a partnership return is filed by an entity but it is determined that the entity is not a partnership, the partnership rules are extended in respect of such year to such entity and its items and to persons holding an interest in such entity, to the extent provided in regulations. Section 6233(b) provides that if a partnership return is filed but it is determined that there is no entity, then rules similar to the rules of § 6233(a) apply. Norwest cited the same regulation relied on by the government, Treas. Reg. 301.6233–1, and stated that it serves to create jurisdiction to determine whether the partnership should be respected as such and also to determine the allocation of items that would be partnership items if the partnership was not disregarded. Norwest then posited that Andantech's depreciation and interest deductions are these kinds of partnership items, and not "affected items." Norwest argued that § 6231(a) and Treas. Reg. 301.6231(a)(3)–1(a)(1), define partnership items to include "partnership aggregate and each partner's share of each of . . . (i) Items of income, gain, loss, deduction, or credit of the partnership" and since depreciation and interest are items of deduction, they are necessarily partnership items under this section.

The record before us is simply not sufficient to enable us to determine which party's argument should carry the day. The Tax Court did not address this issue with any clarity in its decision below, and counsel for the government assured us at oral argument that this issue could be properly considered by the Tax Court upon our remand. The seminal importance of issues of subject matter jurisdiction generally, also weighs in favor of a remand to the Tax Court on this issue, for its determination consistent with our decision that Andantech may be properly disregarded as an entity for tax purposes. Finally, we do not herein specifically address the issue of

whether the Tax Court properly applied the step-transaction doctrine either as an alternative to, or in addition to the sham-transaction doctrine, because that issue is not a necessary part of our finding that the Andantech partnership was a sham and our remand will allow the Tax Court to reexamine its use of that test.

## Conclusion

For the reasons set forth above, we affirm the decision of the Tax Court insofar as it determined that the Andantech Partnership should be disregarded for tax purposes. We remand the other issues for further proceedings consistent with this opinion.

*So ordered.*