128 T.C. No. 16

UNITED STATES TAX COURT

KLIGFELD HOLDINGS, KLIGFELD CORPORATION, Tax Matters Partner,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21330-04.                    Filed May 30, 2007.

In 2004, R sent a notice of deficiency to one of
P's partners for his 2000 taxable year. Because the
item which R adjusted was an affected item under
section 6231(a)(5), I.R.C., R also issued a notice of
final partnership administrative adjustment (FPAA) to P
for its 1999 taxable year, which was the year in which
P claimed the item on its taxes.

Both parties agree that the statute of limitations
for assessing additional tax on the 1999 taxable year
had already expired. P argues that if R is barred from
assessing additional tax for 1999, he is also barred
from issuing an FPAA for 1999. R claims that an FPAA
can be issued at any time as long as at least one
partner can still be assessed additional tax in
relation to either an affected item or a partnership
item (as defined by section 6331(a)(3), I.R.C.). P
moved for summary judgment.

<u>Held</u>: Sections 6501(a) and 6229(a), I.R.C., do
not preclude R from issuing an FPAA for P's 1999
taxable year.

Daniel J. Leer, for petitioner.

John A. Guarnieri, Meso T. Hammoud, and S. Katy Lin, for respondent.


OPINION


HOLMES, Judge:  Marnin Kligfeld contributed a large block of Inktomi Corp. stock to a partnership in 1999.  The stock was shuttled from one partnership to another, theoretically gaining a greatly increased basis along the way.  Most of this stock was sold in 1999.  In 2000, the second partnership distributed the remaining stock with its allegedly increased basis along with the cash proceeds from the 1999 sale.  Kligfeld sold the leftover stock and reported the sale on his 2000 joint return.[1]  The Commissioner challenges the amount of capital gains Kligfeld and Estrin reported on their joint return, but does so by attacking their reported basis.  To do this, he issued a notice of final partnership administrative adjustment (FPAA) which adjusted items on a 1999 partnership return.  The problem is that by the time

_____

[1] Kligfeld and his wife, Margo Estrin, are both parties in a separate, but related, petition before this court regarding their 2000 tax return.  Estrin is included in that petition and is mentioned in this opinion only because she and Kligfeld filed jointly.  Although she and two other family members together owned one percent of Kligfeld Holdings in 2000, Kligfeld is the sole shareholder for Kligfeld Corporation, the tax matters partner in this case, and he and Kligfeld Corporation were the only partners in Kligfeld Holdings during the 1999 taxable year.

the FPAA was issued, more than three years had passed since that partnership filed its 1999 tax return. The Commissioner says that it doesn't matter--the three-year restriction is only on assessments, not on adjustments. Kligfeld's partnership has moved for summary judgment, arguing that three years means three years and the Commissioner's FPAA was too late.

## Background[2]

This case is one battle in the Commissioner's war against an alleged tax shelter called Son-of-BOSS.[3] Son-of-BOSS is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great

---

[2] It should be remembered that the facts described in this section are meant to illuminate the summary judgment motion-- they have not been found to be true after a trial.

[3] See also G-5 Inv. Pship. v. Commissioner, 128 T.C. ___ (2007).

as to provide for large--but not out-of-pocket--losses on their individual tax returns.  Enormous losses are attractive to a select group of taxpayers--those with enormous gains.

Marnin Kligfeld was one such taxpayer.  In 1999, he owned more than 80,000 shares of Inktomi Corporation, a software developer for Internet service providers.  Inktomi's main product, a search engine, succeeded in displacing AltaVista. Eventually, Google displaced Inktomi, and Yahoo! bought what was left of the business in 2003;[4] but in 1999, at the height of the tech boom, Kligfeld's Inktomi stock was worth more than $10 million.  Kligfeld had a basis in the stock of just over $300,000, so if he had simply sold it, he would have incurred a significant capital gain which would have likely resulted in a very large capital gains tax.

But Kligfeld did not simply sell the stock.  Instead, he began a series of transactions that he asserts eliminated, or at least reduced, any capital gains built into the Inktomi stock:

- On September 20, 1999, Kligfeld--in conjunction with his wholly owned "S corporation" Kligfeld Corporation (Corporation)--formed Kligfeld Holdings (Holdings 1) as a California partnership. Kligfeld contributed approximately 83,600 shares of Inktomi stock.[5]

---

[4] See Inktomi Corp., Definitive Proxy Statement (Form DEFM14A) (Feb. 11, 2003).

[5] It is unclear from the record at this stage of the proceedings what Corporation contributed to the partnership or

(continued...)

- On about November 1, 1999, Kligfeld Investments, LLC (Investments), whose sole member was Marnin Kligfeld, engaged in a short sale[6] of U.S. Treasury notes.  Before closing the short sale, Investments transferred the resulting proceeds--along with the attached obligation--to Holdings 1.[7]  At the end of this transaction, Kligfeld owned 99 percent of Holdings 1 and Corporation owned one percent.

- On about November 3, 1999, Holdings 1 closed the short position by buying U.S. Treasury notes and using them to replace those borrowed.

- On November 15, 1999, Kligfeld transferred a 98-percent interest in Holdings 1 to Corporation through a non-taxable section 351[8] exchange.

---

[5](...continued)
when exactly Kligfeld transferred the Inktomi stock to Holdings 1.  It is also unclear what the percentage ownership was at the formation of Holdings 1.

[6] A short sale is the sale of borrowed securities, typically for cash.  The short sale is closed when the short seller buys and returns identical securities to the person from whom he borrowed them.  The amount and characterization of the gain or loss is determined and reported at the time the short sale is closed.  See sec. 1.1233-1(a), Income Tax Regs.

[7] Because Investments is not incorporated and has only one member, it is disregarded for tax purposes, and Kligfeld is treated as contributing the short sale proceeds and obligation himself.  See sec. 301.7701-2(c)(2), Proced. & Admin. Regs.

[8] Unless otherwise indicated, section references are to the Internal Revenue Code as in effect for the years at issue. Section 351 allows a person to transfer property to a corporation with no recognition of gain or loss, as long as he receives only that corporation's stock in exchange for the property and, immediately after the exchange, is "in control" of the corporation.  Kligfeld received only additional Corporation stock in the exchange, and since he was the sole shareholder in Corporation both before and after the transfer, he easily met the "in control" requirement.

Under section 708(b)(1),[9] the transfer of more than 50 percent of Holdings 1 from Kligfeld to Corporation within a single 12-month period arguably triggered a statutory termination, and the creation of a new partnership also named Kligfeld Holdings (Holdings 2).  This new partnership kept the same taxpayer identification number, but Kligfeld now owned only one percent of the partnership, and Corporation owned the remaining 99 percent.

To understand why this termination of Holdings 1 and creation of Holdings 2 matters, one must first understand the partnership-tax concepts of "inside basis" and "outside basis". Inside basis is a partnership's basis in the property which it owns.  For contributed property, the inside basis is initially equal to the contributing partner's adjusted basis in the property.  Sec. 723.  Outside basis is an individual partner's basis in his interest in the partnership itself.  When a partner contributes both cash and property to a partnership, his outside

---

[9] SEC. 708(b).  Termination.--

> (1) General Rule.--For purposes of subsection (a), a partnership shall be considered as terminated only if--
>
> *     *     *     *     *     *     *
>
> (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

basis is initially equal to the amount of cash plus his adjusted basis in the contributed property. Sec. 722; sec. 1.722-1, Example (1), Income Tax Regs. Outside basis increases when a partner contributes additional assets to the partnership or when the partnership has a gain; it decreases when the partner contributes liabilities to the partnership, the partnership has a loss, or the partnership distributes assets to the partner. Sec. 705(a).

When Kligfeld initially contributed the Inktomi stock to Holdings 1, his outside basis in the partnership was equal to his basis in the contributed stock, or approximately $300,000. Likewise, the Inktomi stock continued to have the same inside basis to the partnership as it had before it was contributed-- again, approximately $300,000. When Kligfeld (through Investments) later contributed the proceeds from the short sale, he arguably increased his outside basis in the partnership in an amount equal to the value of those proceeds. However, Kligfeld presumably reasoned that the attached obligation to close out the short sale, an obligation that he also contributed, was a contingent liability and therefore shouldn't reduce his outside basis as contributing a fixed liability would.[10] As a result,

---

[10] Section 752 states that outside basis is decreased by the amount of any personal liability assumed by the partnership. At the time of this transaction, it didn't specifically include contingent liabilities, and so Kligfeld probably reasoned that
(continued...)

Kligfeld conceivably ended up with an outside basis in Holdings 1 of just over $10.5 million, which wasn't reduced when Holdings 1 closed the short sale.[11]  Therefore, when Kligfeld transferred his partnership interest to Corporation, he also might have transferred his high basis and in return, received shares of Corporation stock with the same high basis.

When a new partner acquires a partnership interest, he typically pays fair market value for that interest, which can result in discrepancies between his outside basis and his share of the partnership's inside basis.  To help balance out those discrepancies, section 754 allows a partnership to elect to adjust the inside basis of partnership assets to reflect the new

---

[10](...continued)
the obligation shouldn't be treated as a liability for purposes of basis calculation.  Section 1.752-6(a), Income Tax Regs., which became effective on May 26, 2005, retroactively changed this line of reasoning (or, perhaps, made clear its original weakness).  The regulation states that, for any contingent liability assumed by a partnership between October 18, 1999, and June 24, 2003, the contributing partner must take into consideration the value of the contingent liability as of the date of exchange when determining outside basis.  The validity of the regulation's retroactive application has been a matter of some controversy.  See, e.g., Klamath Strategic Inv. Fund LLC v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006).

[11] Since the obligation wasn't treated as a liability when it was transferred to the partnership, the fulfillment of that obligation wasn't treated as a decrease in Kligfeld's share of partnership liabilities, which would have reduced his outside basis.  See sec. 752(b).

partner's different outside basis.[12]  Since both Holdings 1 and

Holdings 2 attached a section 754 election to their 1999 tax

returns, Holdings 2 adjusted the inside basis of its Inktomi

stock to almost $10.4 million to reflect Corporation's higher

outside basis.[13]

Holdings 2 sold most of the Inktomi stock at the end of 1999

and reported the sale on its 1999 partnership return.  The

capital gain from that sale--now comparatively slight due to the

increase in inside basis--flowed through to the partners, again

increasing their outside basis.  However, Holdings 2 didn't

actually distribute the proceeds from the sale until 2000, when

it distributed both the cash proceeds and the remaining shares of

---

[12] Section 754 allows a partnership to adjust the basis of
its property under section 743, which provides in subsection (b):

> SEC. 743(b) Adjustment to Basis of Partnership
> Property.--In the case of a transfer of an interest in
> a partnership by sale or exchange * * *, a partnership
> with respect to which the election provided in section
> 754 is in effect * * * shall--
>
> > (1) increase the adjusted basis of the
> > partnership property by the excess of the
> > basis to the transferee partner of his
> > interest in the partnership over his
> > proportionate share of the adjusted basis of
> > the partnership property * * *

[13] The assets in Holdings 2 at the time it was created
consisted of cash and the Inktomi stock.  Because cash has a
fixed basis, the only partnership property whose basis could be
adjusted was the stock.  The newly adjusted inside basis
consisted of the original inside basis plus the value of the
short sale proceeds contributed by Kligfeld.

Inktomi stock to its partners.[14]  The distributed cash was treated as a return of capital (i.e., not taxable) since it didn't reduce the outside basis below zero--any cash distributed which exceeded outside basis would be considered a capital gain. Sec. 731(a).  The remaining Inktomi stock that was distributed retained its inside basis in the hands of the partners to the extent of the partners' remaining outside basis after that basis was reduced by the amount of the cash distribution.  Sec. 732.

To reflect the above transactions, each entity filed a tax return:  Holdings 1 filed a partnership return for its brief 1999 taxable year (September 20, 1999-November 15, 1999) on July 17, 2000.  It listed the short sale of the U.S. Treasury notes and claimed sale proceeds of $9,938,281, a basis of $9,965,625, and a resulting loss of $27,344.[15]  Holdings 2 also filed a partnership return for its short 1999 taxable year (November 15, 1999-December 31, 1999) on July 17, 2000, reporting $10,000,004 in proceeds from the sale of Inktomi stock and a gain of $523,337. The Kligfelds filed a joint return for 1999 on August 15, 2000,

---

[14] The record doesn't show precisely how many shares of Inktomi stock were distributed, but Corporation sold 12,000 of the shares it received in November 2000 and distributed all of the cash plus all remaining corporate property to Kligfeld.

[15] The basis listed is the price paid for the replacement securities.  In a regular sale, the securities are first paid for and then sold, with the gain or loss equaling the difference between the purchase and sale price.  In a short sale, the timing is backwards--the sale price is determined before the purchase price.

and a joint return for 2000 on April 29, 2001. Any distributed cash was reported as a nontaxable return of capital rather than a capital gain because the amount of cash distributed never exceeded the adjusted basis.

Meanwhile, the IRS began to notice that very large amounts of capital gains seemed to be disappearing from the nation's tax base via strategies like that of the Kligfelds. In 2000, the IRS released Notice 2000-44, 2000-2 C.B. 255, which gave notice that Son-of-BOSS transactions were officially "listed," meaning the IRS would aggressively pursue all taxpayers who had engaged in them. The IRS reasoned that the transactions didn't reflect economic reality, and the disregarded liabilities must be taken into account when computing basis. Without an inflated basis to shade them, the losses flowing from the partnership would wither away, and taxpayers using the Son-of-BOSS strategy would be left with a large tax bill for their now-unsheltered gains. In June 2003, the government issued a summons to the law firm of Jenkens & Gilchrist, which had been promoting the arrangement. The summons sought the name and address of every U.S. taxpayer who had pursued the strategy.

Kligfeld was among those caught in this summons net. The Commissioner began examining the entities involved, and in September 2004, he sent Holdings 2 an FPAA for its 1999 taxable year. On the same day, he also issued a notice of deficiency to

the Kligfelds for their 2000 taxable year.  Both notices were a result of the Commissioner's determination that Kligfeld should have taken the short sale obligation into consideration when determining outside basis in Holdings 1.  Accordingly, Kligfeld (and Corporation after him) should have had a much lower outside basis, with the following results:  Holdings 2 shouldn't have been able to adjust the Inktomi stock's inside basis under section 754; the later distribution of cash to Corporation exceeded Corporation's much-reduced outside basis and should have been treated, at least in part, as a capital gain; and, finally, the stock distributed to Corporation should have had a basis of zero since Corporation no longer had any outside basis once the cash was distributed.  As a result, the deficiency notice to the Kligfelds showed an increase in capital gain of more than $9.8 million.

Holdings 2 timely filed a petition with this Court to review the FPAA, and the Kligfelds timely filed a petition challenging the notice of deficiency.  Kligfeld, as a representative of Corporation and on behalf of Holdings 2, moved for summary judgment in the partnership case.  He argues that the Commissioner acted too slowly:  the FPAA for the 1999 taxable year was issued more than three years after Holdings 2 filed its 1999 return.  The Commissioner argues in reply that because the

Kligfelds' 2000 personal return reported affected items that relate back to the partnership's 1999 taxable year--i.e., the computation of Kligfeld's (and Corporation's) outside basis which then became the adjusted basis of the Inktomi stock distributed and sold in 2000--the limitations period for making partnership adjustments is still open.

## Discussion

Holdings 1 and Holdings 2 were both partnerships under TEFRA--the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. Each TEFRA partnership, for example, is supposed to designate a tax matters partner (the TMP), to handle the partnership's administrative issues with the IRS and any resulting litigation. (Corporation is the TMP for Holdings 2.)[16] TEFRA aims at determining all partnership items--technically defined in section 6231(a)(3)--at the partnership level; the goal is to have a single point of adjustment for the IRS rather than having to make separate partnership item adjustments on each partner's individual return. See H. Conf. Rept. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63. If the IRS decides to adjust any partnership items on a

---

[16] Corporation, as TMP, is the petitioner in this case. References to "Kligfeld's arguments," "Kligfeld's position," and so forth are technically references to Corporation in this capacity.

partnership return, it must notify the individual partners of the adjustment by issuing an FPAA. Sec. 6223(a). The TMP has ninety days after the Commissioner mails an FPAA to petition for its readjustment.[17]

The specific TEFRA provision at issue in this case is section 6229, which states:

SEC. 6229. PERIOD OF LIMITATIONS FOR MAKING ASSESSMENTS.

(a) General Rule.--Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after* * *

(1) the date on which the partnership return for such taxable year was filed * * *.

* * * * * * *

(d) Suspension When Secretary Makes Administrative Adjustment.--If notice of a final partnership administrative adjustment with respect to any taxable year is mailed to the tax matters partner, the running of the period specified in subsection (a) * * * shall be suspended--

(1) for the period during which an action may be brought under section 6226 (and, if a petition is filed under section 6226 with respect to such administrative adjustment, until the decision of the court becomes final), and

(2) for 1 year thereafter.

---

[17] The TMP can seek readjustment in either the Tax Court, the Court of Federal Claims, or a U.S. District Court. Sec. 6226(a).

In Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533 (2000), we ruled that section 6229(a) does not restrict the time in which the Commissioner may challenge a partnership return, but only ensures that he has at least three years in which to exercise it.[18]  We also held that the suspension described in section 6229(d) affects "any open period of limitations applicable to petitioner on the date the FPAA was issued * * *."  Rhone-Poulenc, 114 T.C. at 554.  The "period of limitations" we referred to is supplied by section 6501, which (with several exceptions) sets a three-year limitations period, measured from the filing or due date of a return, for the Commissioner to assess taxes or issue a notice of deficiency.

Kligfeld's first argument is based on that section.

---

[18] At least two other courts--the D.C. Circuit and the Court of Federal Claims--have agreed with our interpretation of section 6229(a) as creating a minimum, not a maximum, time limit for the Commissioner to adjust partnership items.  Each court noted that construing the section in this way not only honors its plain language, but furthers the Code's goal of treating all partnership items alike.  See Andantech L.L.C. v. Commissioner, 331 F.3d 972, 977 (D.C. Cir. 2003) (plain language of section 6229(a) indicates a minimum period of assessment for partnership items), affg. T.C. Memo. 2002-97; Grapevine Imp. Ltd. v. United States, 71 Fed. Cl. 324, 332-35 (2006) (legislative history supports the conclusion that section 6229(a) augments the basic statute of limitations, ensuring the IRS has sufficient time to scrutinize certain types of transactions); Rhone-Poulenc, 114 T.C. at 544-45 (section 6229(a) provides standard minimum period of time to assess partnership items for all partners; if Congress intended a different meaning, it would have used different language).

A.    Section 6501

Kligfeld relies on the undisputed fact that he and Estrin filed their joint return for 1999 on August 15, 2000, which was after Holdings 2 filed its return.  The Commissioner didn't mail the FPAA to Holdings 2 until September 22, 2004.  Even if the period of limitations was based on the Kligfelds' later filing date, September 22, 2004 is more than three years after August 15, 2000.  Therefore, Kligfeld argues, the FPAA is time-barred and invalid.

The flaw in this argument is plain.  The Commissioner is not arguing that the Kligfelds' 1999 return included partnership items challenged in the FPAA sent to Holdings 2--he's arguing that it was the Kligfelds' 2000 return that included the challenged items.  Their 2000 personal return was filed--again, this is not disputed--in April 2001.

April 2001 is, of course, still more than three years removed from September 2004; but the general three-year limit under section 6501 is subject to a number of exceptions.  The Commissioner relies on section 7609, which Congress added to the Code in response to the problem caused by the reluctance of those selling alleged tax shelters to give up their customers' names to the IRS.  Both parties agree that section 7609 applies here because the IRS issued a "John Doe" summons to Jenkens & Gilchrist, to get the name of each of its clients who

participated in a Son-of-BOSS deal from January 1, 1998 through

June 15, 2003.  The relevant provision is section 7609(e)(2):

> In the absence of the resolution of the
> summoned party's response to the summons, the
> running of any period of limitations under
> section 6501 * * * with respect to any person
> with respect to whose liability the summons
> is issued * * * shall be suspended for the
> period--
>
> > (A) beginning on the date which is
> > 6 months after the service of such
> > summons, and
>
> > (B) ending with the final
> > resolution of such response.

The IRS served Jenkens & Gilchrist with that summons on June

18, 2003, and it was not quickly resolved.  The tolling of

section 6501's three-year limit began on December 18, 2003, six

months after the service of the summons, and continued until May

17, 2004, when information was provided in response to the

summons.  When the tolling began, there were 133 days remaining

on the limitations period; therefore, when the tolling ended,

there were still 133 days remaining and the limitations period

was extended from April 29, 2004--the original date on which the

statute of limitations would have ended--to September 26, 2004.

As the deficiency notice and the FPAA were issued on September

22, 2004, we conclude that there is no statute-of-limitations

problem for the Commissioner based on section 6501 alone.

Note that the key step in this argument is the implicit

assumption that the Commissioner has the power to adjust 1999

partnership items with an eye to determining a deficiency for 2000.  But does the Code allow this--or must there be some "matching" of taxable years challenged by an FPAA and supplying the period to calculate limitations under section 6501(a)?

That is the question to which we now turn.

B.    Section 6229 and the Matching of Taxable Years

Kligfeld[19] begins by making clear that he is not trying to get us to overrule Rhone-Poulenc.  Instead, he is making a subtler point--that we need not, and should not, extend Rhone-Poulenc beyond the situation where the taxable years of a partnership and its partners overlap.  An obvious problem with this position is that we mentioned nothing about the overlapping of taxable years in Rhone-Poulenc itself.  Because Rhone-Poulenc involved the characterization of a single transaction between the partner and partnership, see 114 T.C. at 536, one can infer that the taxable years involved did overlap.  However, we made no finding--and made no mention--of this fact.

Kligfeld has therefore, we believe, identified a real distinction between Rhone-Poulenc and his case, and he makes both textual and policy arguments--including constitutional questions

---

[19] This case is very similar to Bay Way Holdings v. Commissioner, docket No. 5534-05.  Bay Way's TMP filed a summary judgment motion very similar to Kligfeld's, and the Court invited Bay Way to appear as an *amicus curiae* on brief and oral argument of this motion.  When we refer to "Kligfeld's views," we are referring as well to the points made by Bay Way's counsel, Paul J. Sax.

of due process--for why our reading of section 6229 in <u>Rhone-Poulenc</u> leaves enough room for this distinction to make a difference.

Kligfeld's first argument arises from the Commissioner's assertion in this case--an assertion he likewise made in <u>Rhone-Poulenc</u>--that section 6229 imposes no time limit on his authority to issue an FPAA for any taxable year of any partnership.[20] Kligfeld contends that this ignores the admonition given by the Supreme Court over sixty years ago that it "would be all but intolerable * * * to have an income tax system" in which "both the taxpayer and the Government * * * [must] stand ready forever and a day" to contest a tax assessment. <u>Rothensies v. Elec. Storage Battery Co.</u>, 329 U.S. 296, 301 (1946).

This may be true as a background principle of tax law, but taxpayers are better off finding some textual hooks within the Code itself on which to hang their case. And Kligfeld has scanned the Code looking for those hooks. He begins with section

---

[20] At the hearing on the motion, the Commissioner's counsel took an extreme view of the application of <u>Rhone-Poulenc</u>:

> The Court: The Kligfelds, they take the life-enhancing serum, they don't get rid of their distributed partnership property until 2100. They got the property in 1999. The IRS says inflated basis, partnership item, we're going to issue an FPAA for 1999, even though now it's January of 2100. Kosher?

> IRS Counsel: Yes, I believe that is the case, your Honor.

706(a), which states as a general rule that a partner's inclusion of income, loss, deductions, etc., "with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership *ending within or with the taxable year of the partner*." (Emphasis added.) He then applies this rule to the "principle of fixed, periodic accountings" and draws the conclusion that a "statute of limitations for assessment of tax liability" makes sense only when there is an "interlacing of partners' and partnerships' taxable years."

The flaw in this argument is that it reads too much into section 706(a). That section doesn't state a grand, overarching principle that all partnership and affected items of a partnership's taxable year must be reflected in a coinciding or overlapping partner's taxable year. It governs only the inclusion of the partnership's "income, gain, loss, deduction, or credit of the partnership." Not all partnership items--and not all affected items of the sort that are at issue in this case-- fall into one of those five categories.

Kligfeld then turns to section 6226(d)(1)(B), pointing out that it says that a partner may not be a party to a TEFRA proceeding after the day on which "the period within which any tax attributable to such partnership items may be assessed against that partner expired." The phrase "such partnership

items" refers to subsection (d)(1)(A), which discusses "the partnership items of such partner *for the partnership taxable year * * *."* (Emphasis added.) Kligfeld claims that this language supports his reading of the Code's treatment of partners and partnerships--especially its echo of section 706(a)--as requiring that any paired FPAA and notice of deficiency must be for the same or overlapping taxable year.

But Kligfeld focuses on the wrong language within this section of the Code. We agree with the Commissioner that the key language in section 6226(d)(1)(B) is that a partner may be a party to the TEFRA procedure for the period within which "*any tax attributable to* such partnership items" (emphasis added) can be assessed. A tax that is attributable to a particular partnership item need not be reportable by both the partner and the partnership in the same taxable year. For instance, Holdings 2 made the basis adjustments to its Inktomi stock--which was a partnership, or at least affected, item--on its 1999 return, but Corporation reported a taxable capital gain on the later sale of the distributed portion of that same stock on its 2000 return. The potential resulting tax was attributable--in the sense of being at least partially dependent on--that basis computation.

In addition to focusing on the wrong language, Kligfeld also appears to confuse the assessment of tax with the adjustment of

partnership items. Section 6229(a)--the key section in this case--does refer to the partnership's taxable year, but only in reference to assessment of tax and not to adjustment of partnership items. Congress knows how to limit the Commissioner's time to adjust partnership items and not just his time to assess tax. Look at section 6248(a), governing partnerships much larger than Kligfeld's. It says:

> SEC. 6248(a) General Rule.--Except as otherwise provided in this section, no adjustment under this subpart to any partnership item for any partnership taxable year may be made after the date which is 3 years after the later of * * * [the filing date or due date] for such year * * *.

Unlike section 6248(a), section 6229(a) does not set a maximum time limit to make *adjustments*. Since section 6229(a) modifies section 6501, and section 6501 sets a three-year general limitation period for *assessments,* we read the difference in language between the two TEFRA provisions to indicate that Congress anticipated that the taxable year in which an assessment is made would not always be the same as the taxable year in which the adjustments are made.

Kligfeld's final textual argument points us toward three additional TEFRA provisions that, he claims, imply that TEFRA itself requires a matching of partnership and partner taxable years:

- Section 6231(a)(7)(B)--general partner with the largest interest "at the close of the

taxable year involved" designated as default TMP;

- Section 6231(d)(1)(B)--partnership percentage interests determined on the basis of profits interests "as of the close of the partnership taxable year;" and

- Section 6226(c)(1)--right to file a petition challenging the FPAA limited to partners "in such partnership at any time during such year * * *."

Kligfeld correctly points out that these provisions don't seem to contemplate the possibility that this case raises--a situation where the Commissioner issues an FPAA for one taxable year aimed at the treatment of an affected item on a partner's return for a later year.  Imagine a partnership that in 1990 has 50 partners, but due to a great deal of turnover in ownership interests, has 50 completely different partners by 2000.  Were the Commissioner to issue an FPAA for the 1990 taxable year aimed at an affected item on the 2000 tax returns of the current individual partners, who could challenge it?  Under section 6226(c), only the 1990 partners would be partners "in such partnership at any time during such year," but section 6226(d)(1) might deprive them of standing because they would have no interest in the outcome.[21]  And if there were no designated TMP, then who would serve by default?  Section 6231(a)(7) says that it

_____

[21] We assume for the purpose of discussing this hypothetical that all the 1990 partners filed timely, nonfraudulent returns more than three years before disposing of their partnership interests.

would be the general partner with the largest profits interest at the close of the 1990 taxable year, but section 6226(d)(1) might again deprive all the 1990 partners of standing.

Kligfeld argues, and not without some force, that there may be times when reading TEFRA provisions as the Commissioner claims they should be read might lead to strange scenarios like the example above--where the issuance of FPAAs followed by computational adjustments would be unchallengeable by any partner, past or present. The difficulty with this analysis, as a matter of statutory interpretation, is that it doesn't rise to the level of absurdity:[22] In the mill run of cases, the Commissioner will be challenging partnership returns closer in time to the partners' individual returns, and most partnerships do not have such churning partnership rosters. Kligfeld may not be wrong in arguing that such an unchecked exercise of the taxing power would raise a serious question under the due process clause of the fifth amendment. However, a court should "never * * * anticipate a question of constitutional law in advance of the necessity of deciding it." United States v. Raines, 362 U.S. 17, 21 (1960); see also Ayotte v. Planned Parenthood of N. New Eng.,

---

[22] Literal applications of a statute which lead to absurd consequences should be ignored when a different, reasonable application can be applied which is consistent with legislative intent. Lastarmco, Inc. v. Commissioner, 79 T.C. 810, 826 (1982). But the absurdity must be "so gross as to shock the general moral or common sense." Crooks v. Harrelson, 282 U.S. 55, 60 (1930).

546 U.S. 320, 328 (2006) ("when confronting a constitutional flaw in a statute, we try to limit the solution to the problem").  And in this case, the specter is entirely imaginary:  Kligfeld's partnership does not lack a TMP with standing to bring a petition to challenge the FPAA here.

We therefore hold that the Commissioner may issue an FPAA adjusting Holdings 2's partnership items more than three years after Holdings 2 timely filed its partnership return.

<u>An order denying petitioner's summary judgment motion will be issued</u>.