T.C. Memo. 2018-182

UNITED STATES TAX COURT

TRUST U/W/O BH AND MW NAMM F/B/O ANDREW I. NAMM, ANDREW I.
NAMM AND JAMES DORAN, TRUSTEES, TRANSFEREE, ET AL.,[1]
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8485-17, 8487-17,      Filed October 29, 2018.
8488-17, 8490-17,
8496-17, 8498-17,
8499-17, 8500-17,
8501-17.

---

[1]The following cases are consolidated herewith: Andrew I. Namm, Transferee, docket No. 8487-17; Beth N. Doran Revocable Trust, James Doran and Andrew Namm, Trustees, Transferee, docket No. 8488-17; Pamela White, Transferee, docket No. 8490-17; James Perilman, Transferee, docket No. 8496-17; Wendy H. Doran Revocable Trust, James Doran, Wendy H. Doran and Andrew Namm, Trustees, Transferee, docket No. 8498-17; Wendy Doran-Paley, Transferee, docket No. 8499-17; Trust U/W/O Peggotty N. Doran, James Doran and Andrew Namm, Trustees, Transferee, docket No. 8500-17; Barbara P. Lempit, Transferee, docket No. 8501-17.

**[\*2]** <u>Jenny L. Johnson Ware</u>, <u>Guinevere M. Moore</u>, and <u>Shay-Ann Heiser Singh</u>, for petitioners.

<u>Carina J. Campobasso</u> and <u>Janet F. Appel</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  These consolidated cases involve the assertion by the Internal Revenue Service (IRS or respondent) of transferee liability against petitioners, former shareholders of a corporation that was the subject of a "Midco" transaction.  Currently before the Court are cross-motions for summary judgment on the question whether the IRS mailed notices of transferee liability to petitioners within the period of limitations specified in section 6901(c).[2]  Answering that question in respondent's favor, we will grant his motion for partial summary judgment and deny petitioners' cross-motions.

<u>Background</u>

The following facts are derived from the pleadings, the parties' motion papers, and the exhibits attached thereto.  They are stated solely for purposes of de-

---

[2]All statutory references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3] ciding the motions and not as findings of fact in these cases. Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).

Petitioners are former shareholders of Arebec Corp. (Arebec), a C corporation whose assets consisted chiefly of appreciated marketable securities. At the time petitioners were shareholders, Arebec was subject to Federal income tax as a "personal holding company" under section 542. This tax classification was disadvantageous: Section 541 imposes, in addition to applicable income taxes, "a personal holding company tax equal to 20 percent" of undistributed personal holding company income.

Petitioners desired to liquidate Arebec's assets and have the proceeds distributed to them. But this approach would have had the consequence of requiring that Federal and State income tax be paid both at the corporate and at the shareholder level. Petitioner Andrew Namm, a member of Arebec's board of directors, informed his fellow shareholders that Arebec had explored ways to avoid this "double taxation" problem but had found no "credible solutions."

During the late 1990s and early 2000s tax shelter promoters offered purported solutions to this perceived problem. In one common strategy shareholders would sell their stock to a transient intermediary company, which would plan to

**[\*4]** offset the built-in gain with a prepackaged tax shelter, often a Son-of-BOSS scheme.[3] These transactions took a variety of forms and are commonly called "intermediary company" or "Midco" transactions. See Notice 2001-16, 2001-1 C.B. 730, clarified by Notice 2008-111, 2008-51 I.R.B. 1299. These transactions are well summarized in Diebold Found. Inc. v. Commissioner, 736 F.3d 172, 175-176 (2d Cir. 2013), vacating and remanding T.C. Memo. 2010-238.

A.     The Acquisition

In July 2000 a partner at Grant Thornton approached Arebec's management and suggested that Arebec might be a good candidate for sale. He indicated that he had found a suitable buyer, Diversified Group, Inc. (Diversified). Diversified and its president, James Haber, were leading promoters of Midco transactions, and several of their transactions have previously been scrutinized by this Court.[4]

---

[3]Son-of-BOSS tax shelters were variations on a predecessor known as "BOSS, an acronym for 'bond and options sales strategy.'" Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007). Son-of-BOSS schemes typically entailed a series of transactions designed to generate an artificially high basis in a partnership interest. Participants then disposed of their partnership interests, generating artificial losses used to offset participants' real income.

[4]See, e.g., Greenberg v. Commissioner, T.C. Memo. 2018-74; Jacoby v. Commissioner, T.C. Memo. 2015-67; Markell Co. v. Commissioner, T.C. Memo. 2014-86; Humboldt Shelby Holding Corp. v. Commissioner, T.C. Memo. 2014-47, aff'd, 606 F. App'x 20 (2d Cir. 2015).

**[\*5]**  Diversified stated that it would be willing to purchase 100% of Arebec's stock for a price equal to the fair market value of Arebec's assets, less approximately 7% of the capital gain embedded in those assets.  This 7% "haircut" was substantially smaller than the effective rate of Federal tax that would apply to the gain if the securities were sold, which (as Mr. Namm informed his fellow shareholders) was "currently 35%."  Diversified's offering price for the stock thus represented a significant premium over Arebec's net liquidation value.

On August 24, 2000, Mr. Namm and petitioner James Doran, also a member of Arebec's board, met with Diversified's representatives to discuss the proposal.  From August through October the finer points of the deal were negotiated.  On September 22, 2000, AC Acquisition, LLC (AC Acquisition), was formed as a subsidiary of Diversified to act as the buyer.  On October 16, 2000, Arebec's board approved the transaction and AC Acquisition paid $25,170,000 for 100% of Arebec's stock.  The proceeds were placed in a trust for petitioners, and 95.7% of the proceeds was distributed to them the following day.

B.    Events Surrounding the Acquisition

The following facts are affirmatively alleged by respondent in his answer.  In their reply to answer petitioners deny most of these allegations "for lack of sufficient knowledge or information."

**[\*6]**   AC Acquisition, which had negligible assets, financed its purchase of the

Arebec stock with a purported loan of $29 million from a subsidiary of Rabobank,

a Dutch bank that has played a similar fleeting role in other Midco transactions.[5]

The loan was dated October 16, 2000, and was explicitly made contingent on an

agreement by Paine Webber, a brokerage firm, to purchase all of Arebec's assets

immediately after AC Acquisition purchased all of Arebec's stock.  Paine Webber

duly purchased Arebec's assets.

On October 17, 2000, the day after the purported stock acquisition and asset

sale closed, the proceeds from the asset sale, totaling about $26 million, were

withdrawn from Arebec's Paine Webber account and deposited into Arebec's

Rabobank account.  Later that day $25,500,000 was withdrawn from Arebec's

Rabobank account and deposited into AC Acquisition's Rabobank account.  AC

Acquisition immediately used those funds to repay the Rabobank loan in full.

This set of transactions left Arebec, now wholly owned by AC Acquisition, with

negligible assets and a very large tax liability.

---

[5]Rabobank affiliates have provided short-term (usually overnight) financing for other Midco transactions that this Court has considered.  See, e.g., Tricarichi v. Commissioner, T.C. Memo. 2015-201, 110 T.C.M. (CCH) 370, 375-376; Shockley v. Commissioner, T.C. Memo. 2015-113, 109 T.C.M. (CCH) 1579, 1582-1583.

[*7]   On October 23, 2000, Arebec formed and became the sole member of AC Trading, LLC (AC Trading), making a modest capital contribution.  Four days later AC Trading purchased offsetting long- and short-option positions on the Japanese yen.  Given the offsetting nature of these options and the lack of other assets, AC Trading had negligible economic value.  But Arebec claimed a basis in excess of $20 million in AC Trading, valuing the long option at its cost and failing to offset against that value the contingent liability represented by the short option.

Two weeks later Arebec contributed its 100% interest in AC Trading in exchange for an 85% membership interest in AD Equity Investment Fund, LLC (AD Equity), a partnership of which Diversified was the tax matters partner (TMP).  Arebec's purported basis in AD Equity was inflated because of the artificially high basis it claimed in AC Trading.  On December 11, 2000, AD Equity redeemed Arebec's interest for cash and securities of little value.  Arebec's inflated outside basis in AD Equity was transferred to the securities.  Arebec claimed it suffered a short-term loss of $20,986,503 when it sold those securities on December 26, 2000.

C.   Tax Reporting

On December 14, 2001, AD Equity filed Form 1065, U.S. Return of Partnership Income, for the calendar tax year 2000, the year in which it redeemed Are-

[*8] bec's 85% interest.[6]  On January 17, 2002, Arebec filed Form 1120, U.S. Corporation Income Tax Return, for its fiscal year ending (FYE) January 31, 2001. On that return Arebec reported long-term capital gain of $20,187,206, largely from the sale of its appreciated securities portfolio to Paine Webber, and it reported a short-term capital loss of $21,109,722, largely from the sale of the low-value securities received from AD Equity.  It reported negative taxable income and claimed a refund.

On December 14, 2004, the IRS issued a notice of final partnership administrative adjustment (FPAA) to Diversified, AD Equity's TMP.  The FPAA determined that AD Equity had never existed (or had existed solely for tax avoidance purposes) and that its transactions lacked economic substance.  On March 4, 2005, Diversified filed suit on behalf of AD Equity in the U.S. District Court for the Southern District of New York to contest the FPAA adjustments.  On June 25, 2014, the District Court dismissed the case with prejudice, which had the effect of sustaining the FPAA.  See sec. 6226(h) ("[T]he decision of the Court dismissing the action shall be considered as its decision that the notice of final partnership administrative adjustment is correct.").

---

[6]AD Equity's Form 1065 for 2000 was recorded by the IRS computer system as received on December 14, 2001.  Petitioners assert that this return was filed on or before October 15, 2001.  We discuss this issue infra pp. 20-22.

**[\*9]**  Following conclusion of the lengthy partnership proceeding, the IRS issued, on May 12, 2015, a statutory notice of deficiency to Arebec.  The IRS disallowed $19,972,484 of Arebec's reported capital losses, determining a tax deficiency of $6,957,864 and penalties under section 6662 of $2,783,139.  When Arebec did not petition this Court within 90 days, see sec. 6213, the IRS assessed those liabilities together with interest of $9,765,061 through August 17, 2015, the assessment date.

Upon investigation of Arebec the IRS discovered that it had no assets.  The IRS accordingly determined to seek recovery from petitioners as transferees of Arebec.  The IRS issued notices of liability to petitioners on January 18, 2017, and they timely petitioned this Court for review.

## Discussion

### I.  Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials.  See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001).  We may grant partial summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law.  Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmov-

[*10] ing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Sundstrand Corp., 98 T.C. at 520.  The nonmoving party may not rest upon the mere allegations or denials in his pleadings but must set forth specific facts showing that there is a genuine dispute for trial.  Rule 121(d); see Sundstrand Corp., 98 T.C. at 520.

The sole question presented for decision at this stage of the proceedings is whether the IRS mailed notices of liability to petitioners within the applicable period of limitations for assessment.  The parties have filed cross-motions for partial summary judgment on this question, and we find that it may appropriately be adjudicated summarily.

II.    Governing Law

Various petitioners reside in New York (docket Nos. 8485-17, 8487-17, and 8501-17), Connecticut (docket Nos. 8488-17, 8498-17, and 8500-17), New Jersey (docket No. 8499-17), Nevada (docket No. 8490-17), and California (docket No. 8496-17).  Absent stipulation to the contrary, venue for appeal of these cases would apparently be the U.S. Court of Appeals for the Second, Third, and Ninth Circuits, respectively.  See sec. 7482(b)(1)(A); Estate of Israel v. Commissioner, 159 F.3d 593, 595-596 (D.C. Cir. 1998), rev'g and remanding 108 T.C. 208 (1997).  Under Golsen v. Commissioner, 54 T.C. 742, 757, aff'd, 445 F.2d 985

**[*11]** (10th Cir. 1971), we follow the law of the appellate venue. We discern no appreciable differences in the law of the Second, Third, and Ninth Circuits on the issues we are required to address in this opinion.

III.     Period of Limitations Defense

"The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability." Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240 (1990); see Rule 39 (requiring a party to plead specifically "any matter constituting an avoidance or affirmative defense, including * * * the statute of limitations"). This general rule applies to a party who advances a limitations defense in a transferee liability case. See Stuart v. Commissioner, 144 T.C. 235, 245 (2015), vacated on other grounds and remanded, 841 F.3d 777 (8th Cir. 2016).

A party advancing this affirmative defense must make a prima facie case establishing the date on which the relevant tax return was filed, the expiration of the relevant limitations period, and the mailing of the relevant IRS notice after that period had expired. Amesbury Apartments, 95 T.C. at 240-241. If the taxpayer makes that showing, the burden of going forward with the evidence shifts to the Commissioner to show that the limitations bar is not applicable. Id. at 241. If the Commissioner makes that showing, the burden shifts back to the taxpayer to prove

**[*12]** that the "alleged exception to the expiration of the period is invalid or otherwise inapplicable." Ibid. "The burden of proof, i.e., the burden of ultimate persuasion, * * * never shifts from the party who pleads the bar of the statute of limitations." Ibid. (citing Adler v. Commissioner, 85 T.C. 535, 540 (1985)).

When Arebec filed its corporate tax return for its FYE January 31, 2001, it reported a capital loss of $21,109,722. This reported loss stemmed chiefly from the sale of securities it had received from AD Equity, a partnership, in purported redemption of its 85% interest in that partnership. That redemption and the validity of AD Equity as a partnership were the subject of a partnership-level proceeding. Because these cases involve items on a corporate tax return that are "affected items" from a partnership return, two distinct limitations provisions are implicated.

Section 6501(a) sets forth the general rule that Federal income tax must be assessed "within 3 years after the return was filed." Section 6229(a) addresses "the period for assessing any [income] tax * * * with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year." It provides that this assessment period "shall not expire before the date which is 3 years after the later of (1) the date on which the partnership return for

**[\*13]** such taxable year was filed, or (2) the last date for filing such return * * *

(determined without regard to extensions)."

In situations where sections 6501(a) and 6229(a) both apply, this Court has

held that the longer of the two periods controls.  Rhone-Poulenc Surfactants and

Specialities, L.P. v. Commissioner (Rhone-Poulenc), 114 T.C. 533, 540-543

(2000); see also Kligfeld Holdings v. Commissioner, 128 T.C. 192 (2007); G-5

Inv. P'ship v. Commissioner, 128 T.C. 186, 190 (2007).  At least four Courts of

Appeals agree with that conclusion.[7]

---

[7]See Gail Vento, LLC v. United States, 595 F. App'x 170, 175 n.9 (3d Cir. 2014); Curr-Spec Partners, L.P. v. Commissioner, 579 F.3d 391, 399 (5th Cir. 2009), aff'g T.C. Memo. 2007-289; AD Glob. Fund, LLC v. United States, 481 F.3d 1351, 1354-1355 (Fed. Cir. 2007); Andantech L.L.C. v. Commissioner, 331 F.3d 972, 976-977 (D.C. Cir. 2003), aff'g in part and remanding T.C. Memo. 2002-97.  Petitioners contend that the Second Circuit demurred to this approach in Callaway v. Commissioner, 231 F.3d 106, 110, 122 (2d Cir. 2000), rev'g T.C. Memo. 1998-99.  We have previously rejected that contention, noting that the Second Circuit in Callaway did not decide "the issue of the relationship between sections 6229(a) and 6501(a)."  LVI Inv'rs LLC v. Commissioner, T.C. Memo. 2009-254, 98 T.C.M. (CCH) 424, 426.  As we noted in LVI Inv'rs LLC, the Second Circuit in a post-Callaway opinion has indicated its view that section 6229(a), which provides that the assessment period "shall not expire before" a specified date, may simply extend, as opposed to constricting, the time available to assess tax.  See Field v. United States, 381 F.3d 109, 112 n.1, 113 (2d Cir. 2004) (noting that a taxpayer seeking to ground a limitations defense on section 6229(a) "would still need to surmount the fact that section 6229(a), by its terms, does not purport to limit the time available to assess tax, but only to extend limitations otherwise applicable").

**[\*14]** If an FPAA is timely mailed to the TMP for a partnership, section 6229(d) suspends the running of the period of limitations "(1) for the period during which an action may be brought under section 6226 (and, if a petition is filed under section 6226 * * * , until the decision of the court becomes final), and (2) for 1 year thereafter." We held in <u>Rhone-Poulenc</u> that section 6229(d) acts to suspend the running, not only of the section 6229(a) limitations period, but also of the section 6501(a) limitations period, when it is the longer of the two. <u>See</u> 114 T.C. at 552. Several courts have expressed agreement with this holding.[8]

Petitioners disagree with this second holding of <u>Rhone-Poulenc</u> and urge us to reconsider it. Advancing the views expressed by the concurring and dissenting opinions in <u>Rhone-Poulenc</u>, petitioners contend that section 6229(d) does not suspend the running of the section 6501(a) limitations period. <u>See</u> <u>Rhone-Poulenc</u>, 114 T.C. at 560-561 (Halpern, J., concurring in part); <u>id.</u> at 569 (Foley, J., dissenting).

---

[8]<u>See</u> <u>Grapevine Imports, Ltd. v. United States</u>, 71 Fed. Cl. 324, 340 (2006) (rejecting argument that section 6229(d) cannot suspend the running of the section 6501(a) period); <u>AD Glob. Fund, LLC ex rel. N. Hills Holding, Inc. v. United States</u>, 67 Fed. Cl. 657, 694 (2005) (holding that section 6229(d) extended the section 6501(a) period), <u>aff'd</u>, 481 F.3d 1351 (Fed. Cir. 2007); <u>see also</u> <u>Curr-Spec Partners</u>, 579 F.3d at 398 n.38 (suggesting that the section 6501(a) period may be extended by section 6229(d)).

**[*15]** We decline to reconsider either holding in <u>Rhone-Poulenc</u>. But even if we did so, it would not help petitioners. The notices of transferee liability were timely both under the analysis we adopted in <u>Rhone-Poulenc</u> and also under the alternative computation method that petitioners prefer.

A.    <u>Focusing on Arebec's Return and Applying Rhone-Poulenc</u>

The Form 1120 on which Arebec reported the challenged losses was filed on January 17, 2002. Under the general rule of section 6501(a), therefore, the IRS initially had until January 17, 2005, to assess tax against Arebec. The Form 1065 on which AD Equity reported the relevant partnership items was filed on December 14, 2001. Under section 6229(a), the period of limitations for assessing Arebec for the affected items arising from its ownership of AD Equity "[did] not expire before" December 14, 2004. Under our first holding in <u>Rhone-Poulenc</u>, the initial period of limitations on assessment thus ran until January 17, 2005, the later of the two dates. <u>See</u> 114 T.C. at 542.

As we further held in <u>Rhone-Poulenc</u>, section 6229(d) operates to suspend the running of the section 6501(a) period once the IRS issues a timely FPAA to the partnership. <u>Rhone-Poulenc</u>, 114 T.C. at 552. The IRS issued the FPAA to Diversified, the TMP for AD Equity, on December 14, 2004. That date was 34 days before January 17, 2005, the date on which the section 6501(a) period for

[*16] assessing tax against Arebec expired. Pursuant to section 6226(a), Diversified filed a District Court action on behalf of AD Equity to contest the FPAA's determinations.

Under section 6229(d), the running of the remaining 34 days of the limitations period was suspended during the District Court litigation and for one year after the judgment of the District Court became final. Sec. 6229(d)(1) and (2). The District Court dismissed the AD Equity case with prejudice on June 25, 2014, and neither party appealed. That court's judgment thus became final on August 25, 2014, the last day on which a notice of appeal could have been filed.[9] See Miller v. Commissioner, 104 T.C. 378, 383 (1995) (citing sections 6230(g), 7481(a)(1)). Thus, section 6229(d)(2) caused the period of limitations to be suspended for an additional year, until August 25, 2015.

When section 6229(d) suspends a limitations period, any unexpired time left in the original assessment period is tacked on following the suspension. We so held in Aufleger v. Commissioner, where we explained: "The plain meaning of the word 'suspend', in the context of a statute of limitations, is to interrupt

---

[9]An appellant generally has 60 days to file a notice of appeal from a District Court judgment. Fed. R. App. P. 4(a)(1)(B). Because August 24, the 60th day after the District Court's judgment was entered, was a Sunday, the period for appeal was extended to the following Monday. See id. subdiv. (a)(1)(C).

**[*17]** temporarily the running of the limitations period with the expectation that the running of the limitations period will resume at the end of the suspension." 99 T.C. 109, 117-120 (1992).

Here, immediately before the section 6229(d) suspension began, the IRS had 34 days remaining to assess tax against Arebec. The section 6229(d) suspension ended on August 25, 2015. The period for assessing tax against Arebec, as extended by section 6229(d), thus closed 34 days later, on September 28, 2015. The IRS issued the notice of deficiency to Arebec on May 12, 2015, which was well within the period of limitations on assessment defined above. On May 12, 2015, the limitations period still had 139 days left to run.

Upon the mailing of a timely notice of deficiency, section 6503(a) suspends the running of the period of limitations for (at least) the 90-day period during which the taxpayer can file a Tax Court petition, sec. 6213(a), "and for 60 days thereafter." Because Arebec did not file a Tax Court petition, the period for assessing tax against Arebec was suspended for a total of 150 days, i.e., from May 12, 2015, through October 9, 2015. The 139 days remaining in the original period of limitations is tacked on following that suspension. See Aufleger, 99 T.C. at 117. The period for assessing tax against Arebec was thus extended to February 25, 2016.

**[*18]** Section 6901(c) specifies the period of limitations for assessing the tax of a transferor (here Arebec) against transferees of its assets. For "initial transferees," which petitioners are alleged to be, the transferor's tax may be assessed against transferees "within 1 year after the expiration of the period of limitation for assessment against the transferor." Sec. 6901(c)(1). That one-year period ended on February 25, 2017. Because February 25, 2017, was a Saturday, the period of limitations was extended to February 27, the following Monday. See Rule 25(a)(2). The IRS issued notices of transferee liability to petitioners on January 18, 2017. Those notices were therefore timely.

B.    Focusing on AD Equity's Return

We reach the same conclusion if we follow petitioners' suggestion and measure the period of limitations from the filing of AD Equity's return. AD Equity filed its 2000 Form 1065 on December 14, 2001. The baseline period of limitations for assessing tax attributable to any partnership item or affected item of AD Equity ran to December 14, 2004, three years from the date AD Equity filed the return. See sec. 6229(a). The IRS issued the FPAA to Diversified as TMP of AD Equity on December 14, 2004. The FPAA was thus timely under section 6229(a), without taking into account section 6501(a) or our application of that provision in Rhone-Poulenc.

**[\*19]** The FPAA tolls the running of the period of limitations for the period during which a readjustment petition could be brought under section 6226 and (if such a petition is filed) until the court's decision becomes final and for one year thereafter. Sec. 6229(d). On June 25, 2014, the District Court dismissed the partnership case, and that judgment became final on August 25, 2014. See supra p. 16. The running of the period of limitations was thus tolled until August 25, 2015.

The IRS issued an "affected items" notice of deficiency to Arebec on May 12, 2015, well within the period of limitations. Sec. 6229(a). The notice of deficiency tolled the running of the period of limitations for an additional 150 days, see sec. 6503(a), thus extending the period of limitations for assessment against Arebec from August 25, 2015, to January 22, 2016.

The period of limitations for assessing tax against petitioners as initial transferees of Arebec extended for one year after the period for assessment against Arebec. Sec. 6901(c)(1). The IRS thus had until January 22, 2017, to issue notices of transferee liability to petitioners. The IRS issued those notices on January 18, 2017. They were therefore timely under the alternative measurement approach that petitioners suggest.

[*20] C.     Petitioners' Arguments

Petitioners advance two contentions against the conclusions set forth above. Neither has merit.

### 1.     Validity of FPAA Issued to AD Equity

Petitioners' principal contention is that the FPAA issued to AD Equity was untimely. If that were so, petitioners say, the District Court litigation could not have acted to suspend the period of limitations, and section 6226(d) would have no operation here at all. In that event petitioners contend that the notices of liability would be untimely under either of the approaches we have outlined.

We reject this argument for three distinct reasons. First, the issuance of the FPAA on December 14, 2004, was timely for assessment purposes because it was within three years of the filing of Arebec's (the partner's) return on January 17, 2002. See, e.g., G-5 Inv. P'ship, 128 T.C. at 191-192 (applying Rhone-Poulenc and concluding that although the FPAA was issued more than three years after the partnership return was filed, it was timely for assessment purposes because it was issued within three years of the partners' returns on which the affected items appeared); Curr-Spec Partners, L.P. v. Commissioner, 579 F.3d 391, 396 (5th Cir. 2009), aff'g T.C. Memo. 2007-289.

**[\*21]** Second, petitioners have not established that the FPAA was untimely even if the three-year limitations period were treated as running from the filing of AD Equity's (the partnership's) return.  The IRS received AD Equity's Form 1065 for 2000 on December 14, 2001, as shown by IRS computer records.  Those records show a received date ("RCVD DATE") of December 14, 2001 ("20011214"), for a partnership return matching AD Equity's 2000 return.  The IRS issued the FPAA to Diversified, the TMP of AD Equity, exactly three years later, on December 14, 2004.

Petitioners assert that AD Equity filed its 2000 return at least two months earlier, on or before October 15, 2001.  But the only thing they adduce to support that assertion is a letter from AD Equity's tax return preparer informing the partnership that its Form 1065 should be signed and filed on or before that date.  Petitioners have supplied no document (such as a certified mail receipt or a transmittal letter) tending to show that the return was actually mailed to the IRS on or before October 15, 2001.  Nor have they supplied a declaration or affidavit executed by a person with actual knowledge of the circumstances surrounding the return's filing.

Under Rule 121(d), a party opposing summary judgment "may not rest upon the mere allegations or denials of such party's pleading," but must set forth, "by affidavits or declarations * * * specific facts showing that there is a genuine dis-

**[\*22]** pute for trial." See Camerato v. Commissioner, T.C. Memo. 2002-28, 83 T.C.M. (CCH) 1147, 1149 (citing Celotex v. Catrett, 477 U.S. 317, 324 (1986)). The letter referenced by petitioners shows that AD Equity was informed of the due date for its 2000 return. But knowledge that a return is due to be filed on a certain date does not constitute evidence that the return was actually filed on or before that date. Because petitioners have supplied neither direct evidence of the return's mailing nor a declaration or affidavit regarding the circumstances of its filing, we conclude that they have failed to establish a genuine dispute of fact as to whether the return was filed on a date earlier than December 14, 2001, the date shown by the IRS computer records.[10]

---

[10]There is some evidence to support the proposition that the IRS received AD Equity's 2000 return later than December 14, 2001. According to declarations supplied by the IRS agents who conducted AD Equity's examination, its 2000 return was initially posted (erroneously) to its 2001 account with a processing date of January 28, 2002. This error was evidently connected to the late filing of returns in the wake of the September 11, 2001, terrorist attack in New York. An IRS agent accordingly made a notation of "rec'd 01/28/2002" on a copy of AD Equity's 2000 return. The IRS later discovered the computer entry showing that a return matching AD Equity's 2000 return was actually received earlier, on December 14, 2001. Thus, while there is some record evidence pointing to a filing date later than December 14, 2001, there is no record evidence pointing to a filing date earlier than December 14, 2001. But even if petitioners could establish an earlier filing date for the partnership return, our result would not change because Arebec's period of limitations remained open.

[*23] Third, even if petitioners could run the preceding two traps, they face the formidable hurdle of res judicata. "When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound." Commissioner v. Sunnen, 333 U.S. 591, 597 (1948). On June 25, 2014, the District Court dismissed AD Equity's lawsuit with prejudice. Dismissal with prejudice, even a voluntary dismissal as occurred here, constitutes an adjudication on the merits. See Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2d Cir. 1995) ("A voluntary dismissal with prejudice is an adjudication on the merits for purposes of res judicata.").[11] After the conclusion of the AD Equity partnership proceeding, therefore, neither Arebec nor any other partner could challenge the partnership-level determinations made by the District Court. See Koprowski v. Commissioner, 138 T.C. 54, 60 (2012)

---

[11]Other circuits have similarly held that res judicata applies after a voluntary dismissal with prejudice. See, e.g., Jackson v. Dow Chem. Co., 518 F. App'x 99, 102 (3d Cir. 2013) ( "[Plaintiff's] voluntary dismissal with prejudice of his remaining * * * claims also operated as a final judgment on the merits for purposes of claim preclusion."); Warfield v. Allied Signal TBS Holdings, Inc., 267 F.3d 538, 542 (6th Cir. 2001) ( "A voluntary dismissal with prejudice operates as a final adjudication on the merits and has a res judicata effect."); Concha v. London, 62 F.3d 1493, 1507 (9th Cir. 1995) (stating that a voluntary dismissal with prejudice "operates as an adjudication on the merits" and "[b]y obtaining such a dismissal, the plaintiff submits to a judgment that serves to bar his claims forever"); Harrison v. Edison Bros. Apparel Stores, 924 F.2d 530, 534 (4th Cir. 1991) ("A voluntary dismissal with prejudice under Fed. R. Civ. P. 41(a)(2) is a complete adjudication on the merits of the dismissed claim.").

[*24] (quoting Sunnen, 333 U.S. at 597) (noting that parties are bound not only as to matters offered to defeat a claim but also "to any other admissible matter which might have been offered for that purpose").

In the case of a TEFRA partnership, the period of limitations for the assessment of tax attributable to an FPAA is a "'partnership item' that must be raised at the partnership level." Chimblo v. Commissioner, 177 F.3d 119, 125 (2d Cir. 1999), aff'g Estate of Chimblo v. Commissioner, T.C. Memo. 1997-535; see Davenport Recycling Assocs. v. Commissioner, 220 F.3d 1255, 1260-1261 (11th Cir. 2000), aff'g T.C. Memo. 1998-347; Kaplan v. United States, 133 F.3d 469, 473 (7th Cir. 1998); Crowell v. Commissioner, 102 T.C. 683, 693 (1994). A limitations challenge to an assessment stemming from the issuance of the FPAA could thus have been brought only in the partnership proceeding. Chimblo, 177 F.3d at 125. "Allowing individual taxpayers to raise a statute of limitations defense in multiple partner-level proceedings would undermine TEFRA's dual goals of centralizing the treatment of partnership items and ensuring the equal treatment of partners." Ibid.

For this reason, Arebec as a partner in AD Equity could not now challenge the timeliness of the FPAA issued to the partnership. And to the extent petitioners are transferees of Arebec, they are in no better position. "It is well settled that a

**[*25]** transferee is in privity with the transferor for purposes of the Internal Revenue Code." Pert v. Commissioner, 105 T.C. 370, 376 (1995).[12] Indeed, "[i]t would be a strange rule to confer upon the transferee broader rights than the transferor by allowing the transferee to relitigate an issue when a transferor is denied that privilege." Kreuger v. Commissioner, 48 T.C. 824, 830 (1967). Because the final judgment in the District Court action binds both "the parties to the suit and their privies," Sunnen, 338 U.S. at 597, petitioners as transferees of Arebec are precluded from challenging the timeliness of the FPAA that the IRS issued to AD Equity.[13]

---

[12]Petitioners contend that they cannot be in privity with Arebec because they have not yet been determined to be transferees of Arebec. Whether petitioners are "transferees" under Federal and applicable State law involves disputed issues of law and fact that will be resolved at trial. To the extent petitioners seek to have this case resolved without trial, by a grant of summary judgment in their favor, we must view all disputed issues in the light most favorable to respondent. Solely for purposes of ruling on petitioners' period of limitations defense, therefore, we assume that they are transferees of Arebec.

[13]Petitioners err in citing Sawyer Trust of May 1992 v. Commissioner, 133 T.C. 60 (2009), to support their contention that res judicata does not apply. In that case a trust had sold stock of several corporations in a Midco transaction. The IRS initially issued a notice of deficiency to the trust, seeking to increase its fiduciary income tax on the theory that it had underreported its basis in the stock. The trust petitioned this Court, and the case was resolved by a stipulated decision determining no deficiency. "The decision documents reflected a compromise by the parties and were not the result of a trial on the merits," and the parties did not include any stipulations regarding "respondent's theories for determining a

(continued...)

**[\*26]**      2.      <u>Validity of the Notice of Deficiency to Arebec</u>

Petitioners alternatively contend that the notice of deficiency issued to Arebec was invalid and hence that section 6503(a)(1) did not operate to suspend the limitations period for 150 days when Arebec declined to file a Tax Court petition. <u>See</u> <u>supra</u> p. 17. This requires us to dig even deeper into some of TEFRA's more arcane rules.

Section 6503(a)(1) suspends the running of the limitations period of section 6229, "but only with respect to a deficiency described in paragraph (2)(A) or (3) of section 6230(a)." Paragraph (3) of section 6230(a), relating to "innocent spouse relief," has no relevance here. Paragraph (2)(A) provides that deficiency procedures apply to any deficiency attributable to affected items "which require partner level determinations," other than certain penalties and additions to tax. On the

---

[13](...continued)
deficiency." <u>Id.</u> at 67. The IRS later sent a notice of transferee liability to the trust, seeking to collect from it the unpaid corporate income tax of the corporations, from whom all assets had been stripped. We held that res judicata did not bar the transferee case for three reasons: (1) the transferee case involved a different tax liability, viz., transferee liability for unpaid corporate tax as opposed to direct liability for fiduciary income tax, (2) the deficiency case, which had been resolved by a stipulated decision reflecting a compromise, did not adjudicate any factual or legal issues, and (3) the issue of transferee liability could not possibly have been litigated in the deficiency case. <u>See id.</u> at 70-78. Here, by contrast, the merits of the partnership-level issues, including the validity of the FPAA issued to AD Equity, were actually adjudicated in the prior District Court case and could only have been adjudicated there.

[*27] other hand, section 6230(a)(1) provides that deficiency procedures "shall not apply to the assessment or collection of any computational adjustment," unless it is a computational adjustment covered by paragraph (2)(A) or (3). In short, section 6503(a)(1) does not suspend the section 6229 limitations period where no partner-level determinations entailing deficiency procedures are required.

Petitioners urge that this was such a case. Once AD Equity had been determined in the District Court litigation to be a sham, petitioners contend that no partner-level determinations were needed to implement the FPAA's adjustments at the partner level. Rather, the IRS could supposedly have omitted to send Arebec a notice of deficiency and have assessed Arebec's tax liability as a "computational adjustment" under section 6230(a)(1). We are unpersuaded by this argument.

Regulations issued under section 6231 explain that there are various types of "computational adjustments," some of which require partner-level determinations and some of which do not. See sec. 301.6231(a)(6)-1T, Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3840 (Jan. 26, 1999).[14] For example, if "the threshold amount of medical deductions under section 213" changes as the result of a partnership-level determination, that computational adjustment "do[es] not

_____

[14]Sec. 301.6231(a)(6)-1T, a temporary regulation applicable for tax years beginning before October 4, 2001, applies to this case. It has since been replaced by a permanent regulation. See sec. 301.6231(a)(6)-1, Proced. & Admin. Regs.

[*28] require [a] partner level determination[]" and is "directly assessed." Id. para. (a)(1). On the other hand, the determination of a partner's "at-risk amount," to the extent it depends on the source from which he obtained the funds for his partnership contribution, "require[s] partner level determinations" and thus involves "computational adjustments subject to deficiency procedures." Id. subpara. (2). A ruling that a particular adjustment does not require a partner-level determination means that partners do not have a prepayment forum, which section 6230(a)(2)(A) otherwise supplies. See Greenwald v. Commissioner, 142 T.C. 308, 317 (2014).

We have previously held that the disallowance of loss deductions following a distribution from a sham partnership required partner-level determinations in a deficiency proceeding. See Domulewicz v. Commissioner, 129 T.C. 11 (2007), aff'd on this issue sub nom. Desmet v. Commissioner, 581 F.3d 297 (6th Cir. 2009). That case resembles this one in relevant respects. The taxpayers in Domulewicz were partners in a partnership that participated in a Son-of-BOSS tax shelter; the partnership distributed low-value securities to the partners' S corporation; the partners reported large capital losses from the S corporation's sale of those securities; the IRS issued an FPAA to the partnership determining that it was a sham; and no one petitioned this Court in response to the FPAA. The IRS there-

[*29] after sent petitioners a notice of deficiency denying the claimed capital loss deductions. See id. at 14-16.

The taxpayers in Domulewicz argued that we lacked jurisdiction of the deficiency case, asserting that the determination of their capital gain or loss was a mere "computational adjustment" requiring no partner-level factual determinations. We rejected that argument. Notwithstanding the prior determination that the partnership was a sham, the IRS still "needed to determine, among other things, whether the stock that was the subject of the sale was the same stock distributed by * * * [the partnership], the portion of that stock actually sold, the holding period for the stock, and the character of any gain or loss." Id. at 20. "Nor did the FPAA definitively determine the outside basis of any * * * partner" in his partnership interest. Ibid. For these reasons, we concluded that the IRS could not have made a final determination of the taxpayers' capital gain or loss "simply by examining [their] * * * Federal income tax return and making mere ministerial adjustments." Id. at 21. Because factual determinations were required at the partner level, we held that we had jurisdiction of the deficiency case under section 6230(a)(2).

The Ninth Circuit reasoned similarly in Napoliello v. Commissioner, 655 F.3d 1060 (9th Cir. 2011), aff'g T.C. Memo. 2009-104. There a sham partnership

**[\*30]** distributed to the taxpayer securities and cash in liquidation of his partnership interest. Id. at 1062. The taxpayer sold the securities and claimed a large loss deduction. Ibid. The court held that partner-level determinations were necessary because the partnership-level proceedings did not conclusively determine the identity of the securities used to generate the loss. Id. at 1064.

Similar reasoning applies here. Arebec made a capital contribution to AC Trading in exchange for a 100% partnership interest in AC Trading, contributed that interest to AD Equity in exchange for an 85% interest in AD Equity, and received cash and securities from AD Equity in redemption of its partnership interest. Notwithstanding the determination that AD Equity was a sham, partner-level proceedings were required to determine the amount of Arebec's gain or loss on sale of those securities and the character of any loss. These factual determinations included: (1) whether the securities Arebec sold were the same securities that AD Equity had distributed, (2) the portion of the securities actually sold, (3) Arebec's holding period for the securities, (4) the character of Arebec's gain or loss, and (5) Arebec's basis in its partnership interest in AC Trading when it contributed that interest to AD Equity. See Domulewicz, 129 T.C. at 20-21. The fact that some of these partner-level determinations, once made, might resemble those made tentatively or provisionally in the FPAA does not matter: "Neither the Code

**[\*31]** nor the regulations \* \* \* require that partner-level determinations actually result in a substantive change to a determination made at the partnership level." Id. at 20.[15]

Petitioners err in relying on United States v. Woods, 571 U.S. 31 (2013), for the proposition that no partner-level determinations are required once a partnership has been determined to be a sham. The Supreme Court there ruled that this Court has jurisdiction in a partnership proceeding to "determine the applicability of any penalty that could result from an adjustment to a partnership item, even if imposing the penalty would also require determining affected or non-partnership items such as outside basis." Id. at 41. The Supreme Court explained that our Court in the partnership proceeding would be making only a "provisional" determination, that is, "whether adjustments properly made at the partnership level have the potential to trigger the penalty." Ibid. (emphasis added). The Supreme Court noted that each partner would "remain[] free to raise, in subsequent, partner-

---

[15]Petitioners urge that Domulewicz is distinguishable because the securities sold in that case were not identified on the partner's return, whereas Arebec's return showed that some securities were acquired on October 27, 2000, and sold two months later. Cf. Domulewicz, 129 T.C. at 21. Contrary to petitioners' view, the outcome is not determined by parsing the fine points of the partners' returns and hypothesizing what inferences the IRS might draw therefrom. The key point in both this case and Domulewicz is that a partner-level determination was needed, including (in this case) a determination of Arebec's basis in its partnership interest in AC Trading.

**[\*32]** level proceedings, any reasons why the penalty may not be imposed on him specifically." Id. at 42. The Woods case plainly does not stand for the proposition that no partner-level determinations are required once a partnership has been ruled a sham.[16]

In sum, petitioners' assertion that the notice of deficiency issued to Arebec was void ab initio derives no support from the opinions of the Supreme Court, the Courts of Appeals, or other binding judicial precedent. The determination that AD Equity was a sham, effectively made in 2014 by the District Court when dismissing the partnership case, did not resolve nonpartnership items and other factual issues unique to each partner. The need to make the fact-based partner-level determinations discussed above required the IRS to follow normal deficiency procedures, thus affording partners a prepayment forum to dispute the IRS' determinations. See Greenwald, 142 T.C. at 317. Because deficiency procedures were required under section 6230(a)(2)(A), section 6503(a)(1) operated to suspend the running of the section 6229(a) assessment period for the 90-day period during which Arebec could have petitioned this Court and for 60 days thereafter. And

---

[16]Petitioners likewise err in relying on Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 119 (2012). Our decision in that case was reversed in relevant part by the U.S. Court of Appeals for the D.C. Circuit. See Logan Trust v. Commissioner, 616 F. App'x 426, 429 (D.C. Cir. 2015).

[*33] because that step and all other steps of respondent's computation of the relevant limitations period are correct, we reject petitioners' affirmative defense based on the period of limitations.

To implement the foregoing,

Appropriate orders will be issued denying petitioners' motions for summary judgment and granting respondent's cross-motion for partial summary judgment.